SNIDER, Appellant, v. CHICAGO & ALTON RAILWAY COMPANY, Appellant, and GRANITE CITY & ST. LOUIS RAILWAY COMPANY, Respondent.

St. Louis Court of Appeals, November 15, 1904.

1. NEGLIGENCE: Master and Servant: Prima Facie Case. In an action against both a street railway company and a railroad company for damages on account of injuries received by plaintiff while a passenger on a car of the street railway company, by a collision with a train of the railroad company at a crossing, where the evidence tended to show that a switchman on the back of the train gave the motorman of the street car a signal to cross, and when the motorman proceeded to do so, the train backed into his car, a motion for nonsuit on the part of the railroad company was properly denied.

2. ———: Carrier of Passengers: Degree of Care. An instruction requiring of the street railway company, under the circumstances, to exercise very high degree of care and foresight in protecting the plaintiff was proper.

3. ———: Master and Servant. An instruction authorizing a verdict against the railroad company in case its servant, acting within the scope of his authority, gave a signal to the motorman to go forward and in doing so acted negligently, was proper.

4. ———: ———: Liability of Master. A master is not liable for the negligent act of a servant unless the act is within the scope of the servant's employment.

5. ———: ———: ———: Scope of Employment. Where, under such circumstances, the signal to the motorman to go ahead was given by a yard conductor who had charge of the train in question, and the evidence showed that he had theretofore given signals to people about to cross the track, and that other employees of the railroad company, occupying the same position had given signals to travelers when to cross, it was for the jury to determine whether he was acting within the scope of his authority.

6. DAMAGES: Personal Injuries: Excessive Verdict. Where the plaintiff, in an action for personal injuries, showed that he received a nervous shock and a painful injury to his fingers for which he was under treatment for three months and that such injuries disabled him from following his trade as an electrician and reduced his earnings from $85 a month to $36 a month, a verdict for $1,975, having received the sanction of the trial judge in his refusal to set it aside, will not be disturbed by the appellate court.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

Action for damages against the Granite City and St. Louis Railway Company and the Chicago & Alton Railway Company, and from verdict in favor of the Street Railway Company and against the Railroad Company, both plaintiff and Railroad Company appealed.

AFFIRMED.

*Johnson & Richards, Chas. Claflin Allen* and *John H. Holliday* for appellant.

(1) The court erred in overruling appellant's demurrer to the evidence offered at the close of plaintiff's case. (2) To make the master liable for the negligent acts of the servant, such acts must be shown to have been performed within the scope of the servant's employment and in furtherance thereof. Meade v. Railroad, 68 Mo. App. 92; Cousins v. Railroad, 66 Mo. 572; Snyder v. Railroad, 60 Mo. 413; Walker v. Railroad, 121 Mo. 575; 26 S. W. 360; Raming v. Railroad, 157 Mo. 509, 57 S. W. 268; Hartman v. Muehlbach, 64 Mo. App. 565; Jones v. Packet Co., 43 Mo. App. 398; Farber v. Railroad, 32 Mo. App. 381; s. c., 116 Mo. 94; Sherman v. Railroad, 72 Mo. 65; Stringer v. Railroad, 96 Mo. 299, 9 S. W. 905. (3) The evidence all showed that the acts of appellant's servants, even if performed as alleged, were not within the scope of their employment. Sherman v. Railroad, 72 Mo. 63; Flower v. Railroad, 69 Pa. St. 210; Coal Co. v. Heeman, 86 Pa. St. 418; Marion v. Railroad, 59 Iowa 428. (4) The evidence all showed that the acts of appellant's servants, even if performed as alleged, were not negligent. Graney v. Railroad, 157 Mo. 666, 57 S. W. 276; Fuchs v. St. Louis, 167 Mo. 620, 67 S. W. 610.

*A. R. Taylor* and *Morris Tucker* for Snider, appellant.

(1) Where a duty is imposed on a corporation, which, in its very nature must be performed by a servant not under the immediate eye of its officers, it follows from the necessity of the case that the act of the servant is the act of the principal and that the servant is *pro hac vice* the corporation itself. State ex rel. v. Railroad, 149 Mo. 104, 50 S. W. 278. (2) A principal is responsible for the acts of his agent within his apparent authority although the agent acts in disobedience of the principal's positive orders. Clark v. South Elect., 72 Mo. App. 506; Brennan v. South Elect., 72 Mo. App. 108; Knowles v. Bulline, 71 Mo. App. 341. (3) The test of a master's responsiblity for the acts of his servant is whether the act was done in the prosecution of the master's business, either expressly or by implication, not whether it was done in accordance with the instructions of the master to the servant. Haehl v. Wabash, 119 Mo. 340, 24 S. W. 737; Cosgrove v. Ogden, 49 N. Y. 255, 14 Negl. Rep. 266; McCormick v. Railroad, Idem 303; Glendell v. Thomsen, 56 N. Y. 194. (4) Master liable if at the time servant was acting within general scope of authority, whether he has departed from instructions or not. Rounds v. Railroad, 8 Am. Negl. Cases 536. (5) Master liable for act of servant if done in course of employment, whether willful, negligent or contrary to order of master. Ramsden v. Railroad (Mass.), 8 Am. Negl. Cases 372.

*Dickson, Smith & Dickson* for respondent.

The second instruction given on behalf of respondent, the Granite City & St. Louis Railway Company, and complained of by the appellant Snider, imposes, as a matter of law, a higher responsibility on respondent than the law of this State requires. Sweeney v. Railroad, 150 Mo. 385, 51 S. W. 682; Sullivan v. Railroad,

133 Mo. 1, 34 S. W. 566; Jackson v. Railroad, 118 Mo. 199, 24 S. W. 192; Parker v. Railroad, 69 Mo. App. 54.

STATEMENT.

On July 26, 1903, plaintiff was a passenger on a street car operated by defendant, the Granite City & St. Louis Railway Company. The car collided with a train of the Chicago & Alton Railway Company at Granite City, in the State of Illinois, and plaintiff was injured. He sued both the street and steam railway companies to recover damages sustained by reason of the collision.

The allegations of negligence against the Chicago & Alton Railway Company are as follows:

"And the plaintiff further avers that the defendant, the Chicago & Alton Railway Company, and its agents and servants in charge and control of the management and running of its cars, so carelessly and negligently managed and controlled the movements of its cars as to cause and suffer said cars to run into and collide with the car of the defendant Granite City and St. Louis Railway Company on which the plaintiff was such passenger. And the plaintiff avers that the said defendant, the Chicago & Alton Railway Company was negligent in failing to ring the bell on the engine eighty rods from the crossing and to sound the whistle eighty rods from the crossing and to continue to ring the bell and sound the whistle until the crossing was reached, according to the statutes of Illinois, chapter 114, paragraph 74, sec. 6, entitled 'Bell & Whistle—Crossing,' page 3226 of vol. 3, Star & Curtis' Illinois Statutes, which said negligence directly contributed to cause said collision and plaintiff's said injuries.

"And plaintiff further avers that the defendant Chicago & Alton Railway Company was guilty of negligence in this, that the servants and agents of said company, carelessly and negligently, signalled the agents and servants of the defendant, Granite City &

St. Louis Railway Company in charge of the car on which the plaintiff was such passenger, to proceed across said track and crossing, which said negligence directly contributed to cause said collision and plaintiff's said injuries."

The jury found in favor of the street railway company, but against the Chicago & Alton Railway Company and assessed plaintiff's damages at $1975, the full amount sued for, and judgments were rendered accordingly. The plaintiff appealed from the judgment in favor of the street railway company, and the Chicago & Alton Railway Company appealed from the judgment against it. Both appeals are presented here in one record and both will be disposed of by this opinion.

The street railway runs east and west on Ferry street through Granite City and crosses the tracks of the Chicago & Alton Railway Company at right angles where they cross Ferry street running north and south. Ferry street is a public street, but no gates or guards are maintained by the Chicago & Alton Railway Company where its tracks (four in number) cross the street. The car on which plaintiff was a passenger when injured was heavily loaded, having on it seventy-five or eighty passengers. Plaintiff testified that the car was so crowded that he stood on the right side of the front platform (south side of car as it was moving east) with his right hand clasping the upright which supported the roof of the car; that when the car crossed Ferry street, he was looking at a train of cars standing on the north side of the street and while in this position a train from the south backed into the street car, catching the middle and third finger of his right hand between the car and the upright to which he was holding, injuring them. He stated that the street car did not stop before proceeding to cross Ferry street and that he did not hear any one call to the motorman

to proceed across the railway tracks nor see any signal given him to proceed.

Mrs. Sophie Smith testified that she sat behind the motorman on the front platform of the street car and the car did not stop before proceeding across the street, that the train which collided with the car was about fifteen feet south of the street and backing north toward the crossing when the street car proceeded across the tracks. She did not hear anyone call to the motorman or see any one give him a signal.

Miss Sophie Smith testified that she was standing in the doorway on the front platform of the car which was moving slowly. She saw a hand signal by a man, who was on one of the Chicago & Alton cars, facing the motorman, and that the signal, as she understood it, was for the motorman to come ahead, and as he did so the train backed up and the collision took place. This was all the evidence offered by plaintiff, in respect to the collision.

The conductor in charge of the car testified for the street railway company that he stopped his car before proceeding to cross the Chicago & Alton tracks; that there was a train backing in from the south, but it stopped five or six feet south of the street car tracks, and to make sure that every thing was all right he asked the switchman who said to him, "Yes, come ahead." He started and the minute he got on the track, the railroad car crashed into his car; that the man who gave him the signal and told him to come ahead was E. C. Rechter, who was yardmaster of the train south of the crossing; that Rechter was standing on the ground north of the crossing when he gave him the signal and told him to come ahead. The engine was several hundred feet south on a curve and could not be seen from the crossing. The collision occurred on the third or fourth track of the Chicago and Alton railroad. He saw no switchman on the train until after the collision, when he saw one on or about the tenth car from the

rear end of the train. No one gave him a signal, from the top of the car or train, to cross the track. At the time of the collision, his car was moving at a speed of about three miles an hour.

Lammering, McDuvall, Lavin and Irwin, witnesses, for the street railway company, all testified that they heard the motorman ask if it was all right to come ahead, and some one answered, "Yes, come ahead."

The evidence for the Chicago & Alton Railway Company shows that Rechter was a yard conductor or foreman, at the time of the collision, and that it was not his duty to signal any one to cross the tracks, that he had no duties in the nature of a watchman or flagman.

On cross-examination of Buck, general yardmaster of the Chicago & Alton Railway Company, we find the following evidence:

"Q. Now this yard conductor, you say, has no function at all in the way of giving notice to people before he.backs his train over a public highway? A. I did not say that at all.

"Q. Has he not the ordinary duty before a train is backed across a public crossing to get out if his switchmen are not out and give notice to the people who may be on the street that the train is about to back and see that they are out of the way? A. Certainly; the man is supposed to protect his train and to protect himself and not destroy any property."

"Q. . . . Where there are neither gates nor watchmen, who does the guarding? A. The men in charge of the train protect their train, certainly, to keep it from going into anything on the crossing.

"Q. As you have said the hind watchman or yard conductor, whoever the individual might be, who was at the back of this long train, in order to reach the engineer would have to signal the middle man, who would be on the curve, and the middle man would give the signal to the engineer? A. Yes, sir."

Here follows a long examination of Buck in regard to the slack in a train. Reduced to what it tends to prove, we find that in Buck's opinion, the slack is from three to six inches to each car, and a standing train, when hit hard enough in front by an engine, the slack, without moving the front car, will be knocked out of the train and move the rear end car from three to six inches for every car in the train. The evidence tends to show that there were about forty cars in the train that collided with the street car, but there is no evidence that it was hit by an engine backing up against the front end of it.

Rechter testified that he was in charge of the train that was being made up on the south side of the crossing; that the train had about forty cars, that he did not give a signal for the train to move nor did he give any signal to the motorman to proceed across the track; that the place where the accident happened was a public highway; that he was the man at the tail end of the train to direct its movements, and the train should not have been moved without his signal; that he never gave signals to come ahead but that he would give signals to stay back; that if any one should ask him if they might cross, he might tell them they could.

W. E. Burton, a yard conductor of the Chicago & Alton Railway Company, testified as follows, in his direct examination:

"It was no part of a yard conductor's duty to signal persons to come on the tracks, nor was it a common practice on his part to do so, in fact, he never gave such signals."

On cross-examination, the above witness testified as follows:

"Q. You mean to say you have never responded to requests of that kind made by motormen or drivers of teams? A. I have given them signals when I knew everything to be perfectly safe; I have told them at times when I knew things to be perfectly safe and these

times are when very few cars are in the yard and I can see and know that things are safe.

"Q. And in the event that you were there in control of it and it was stationary and a driver of a street car or any other conveyance were to ask you whether it was safe, would you not and do you not commonly reply to him that it was safe or that it was not? A. In case I knew it was safe I would say so."

BLAND, P. J., (after stating the facts).—1. At the close of plaintiff's case the Chicago & Alton Railway Company offered an instruction in the nature of a demurrer to the evidence which the court refused to give.

Plaintiff's injury was caused by the negligence of one or both of the railway companies, and his evidence tended to prove negligence on the part of both; on the part of the street car company in that the motorman proceeded to cross the tracks of the Chicago & Alton Railway Company without stopping to look and listen for an approaching train, provided he was not told or signalled to come ahead by an authorized agent of the Chicago & Alton Railway Company. If the evidence of Miss Smith is to be given credit, then it appears that a switchman on the back end of the train gave the motorman a signal to cross the tracks and when he proceeded to do so the train collided with the car. The argument, made to break the force of her evidence, that she did not know what train it was or whether or not the man on the train was a switchman is fallacious, for the reason the train she saw the man on was the one that collided with the street car, and it is not denied that this was a Chicago & Alton train, and the man she saw was dressed like a switchman, was on this train and was acting as a switchman and looked like one. Railroad management is not so loose as to permit or suffer anyone, other than an authorized person, to be upon its freight trains acting as such,

especially in its yards, where the train is under the eyes of the yard superintendents and switch bosses. We think the instruction for a nonsuit was rightfully denied.

2. In respect to the negligent acts of the two defendants upon which the plaintiff might recover of both, the court instructed the jury as follows:

"And if you further find from the evidence that the defendant Granite City and St. Louis Railway Company by its servants in charge of its cars could have prevented said collision by the exercise of a very high degree of care and foresight of skillful, careful and practical railroad operatives under the same or similar circumstances, then the plaintiff is entitled to recover as against the defendant Granite City and St. Louis Railway Company.

"And if the jury find from the evidence in the case that the servants of defendant Chicago & Alton Railway Company acting within the scope of their authority as defined in another instruction given for the Chicago & Alton Railway Company, prior to the collision, signalled the motorman in charge of the Granite City company car to come forward and in doing so acted negligently and thereby directly contributed to cause said collision and plaintiff's said injuries, then plaintiff is also entitled to recover as against the Chicago & Alton Railway Company."

The instruction referred to as given for the Chicago & Alton Railway Company reads as follows:

"The court instructs the jury that a principal is not bound by the acts of his agents and servants except when such acts are within the scope of the authority of such agents or servants. Therefore, even if the jury believe from the evidence that a person or persons in the employ of the Chicago & Alton Railway Company signalled the agents and servants of the Granite City & St. Louis Railway Company in charge of the car on which the plaintiff was a passenger, to pro-

ceed across the track and crossing of the Chicago & Alton Railway, nevertheless, if the jury believe from the evidence that the act of such person or persons in so signalling was not within the scope of the authority of such person or persons then the defendant Chicago & Alton Railway Company cannot be held liable in this action by reason of such acts of such person or persons.''

These instructions are predicated on the pleadings and on the evidence considered as a whole, and are, in our opinion, unobjectionable.

2.  The evidence offered by the defendant shows that the motorman did not see the signal given (if one was given) by the switchmen, but that he was guided by a signal from Rechter and by Rechter's assurance that it was safe for his car to cross the tracks. Rechter denied that he gave any such signal or assurance, but the motorman and four other witnesses testified that he did, and we think it was on their evidence that the jury found the issues for the defendant street car company, and held the Chicago & Alton Railway Company liable.  Viewing the case from this phase of the evidence, the Chicago & Alton Railway Company contends that there is no evidence showing or tending to show that it was within the scope of Rechter's authority as yard conductor to give signals to persons or vehicles to cross the railroad tracks over the street, and for this reason the Chicago & Alton Railway Company ought not to be held liable, even if Rechter did signal the motorman to cross the tracks.  If this contention is supported by the evidence, that is, if there is no substantial evidence showing or tending to show that Rechter was acting within the scope of his authority when he gave the signal, then it ought to be ruled in favor of the Chicago & Alton Railway Company, for a master is not liable for the negligent acts of his servants, unless the act is within the scope of the servant's employment.  This is well settled law everywhere.

The preponderance of the evidence shows that there was no brakesman or switchman on the end of the train to give warning of its movements or intended movements over the street; and that there were no gates at the street crossing, nor was there a flagman stationed there. It shows that the train had backed up to within five or six feet of the outer rail of the street railway track. It shows that if the head end of the train had been struck by an engine backing up to couple on to it, the slack in the forty cars composing the train would have sent the rear car over the street railway track. It shows that Rechter was yard conductor and had charge of this train; that he was at the crossing when the street car approached and was the only employee of the Chicago & Alton Railway Company present who might speak or give signals in respect to the movements of the train toward the crossing, and it shows that he did give the motorman a signal to cross the tracks. It shows that Rechter had theretofore given signals or told people to stay back from the crossing. It shows that other employees of the Chicago & Alton Railway Company, occupying the same position as Rechter, had given signals to travelers to cross these tracks at the street crossing, and it is in evidence that it was the duty of Rechter and other yard conductors to protect the trains and property when making street crossings and, indeed, it would be an unreasonable restriction of the authority of these yard conductors who superintend the making up of trains and have control of them while in their yards, if they were not authorized to say to people about to cross the tracks at a street crossing, that it was or was not safe to cross, and we think there is substantial evidence tending to show that Rechter was acting within the scope of his employment when he signalled the motorman (if he did signal him) to cross the tracks, and the court did not err in directing the jury, by an appropriate instruction, to find whether or not he was acting within the

scope of his employment at the time he gave the signal.

3.   One of the grounds assigned in the motion for new trial is that the damages assessed are excessive, and it is contended here that, if for no other reason, the judgment should be reversed for the reason that the damages assessed are largely in excess of a full and adequate compensation for the injury received.

The plaintiff testified that he was twenty-eight years old and was an electrician.  He sustained a shock to his nervous system and his right hand and fingers thereof were injured.  He was under the doctor's care for three months, being treated for his nervous trouble and injury to his fingers.  That one of the fingers was now all right, but that the middle finger of his right hand is still stiff.  He is totally disabled from following his trade as an electrician, having done no work as such since his injuries, and now earns nine dollars per week as a bookkeeper, but before the accident he earned from eighty-five to one hundred dollars per month.

"Q.  How much did you earn as an electrician? A.  I earned as an electrician fifty cents an hour.

"Q.  What were your average earnings before you were hurt, monthly?   A.   It amounted from $85 to $100.

"Q.  How much do you earn now?  A.  $9 a week; that is, $36 a month.

"Q.  State whether or not you have done any practical work since this injury?  A.  No, sir; not an hour's work in practical business.

"Q.  Did you attempt to work?  A.  Yes, sir.

"Q.  Well, why didn't you do it?  A.  I could not, the pain in the right hand was so hard I couldn't do it; whenever I was called in places I didn't trust myself. I had to be cool and collected; my nervous system is not that way any more.

"Q.  How have these injuries been with reference to pain and suffering?  A.  Well, the first couple of

weeks it was only seldom that I could sleep in the night; I was walking the floor of the room almost every night from three to four hours.

"Q. Does your hand pain you now? A. When I put it in motion, yes, sir.

"Q. What was your physical condition before you were hurt? A. I was always healthy and I could work."

Dr. Fries, who treated the plaintiff for his injury, testified that plaintiff suffered from shock as well as from a severe contusion of the middle finger of the right hand and a slighter contusion of the ring finger. That his services were reasonably worth from fifty to seventy-five dollars. That he examined plaintiff's hand a day before the day of the trial on the twenty-fifth day of February, 1904, and found the middle finger to be anchylosed. That the stiffness of plaintiff's middle finger had been lessened since he treated him and he. did not think the lifting power of his right hand had been impaired, though he had not regained his full strength in it at the time of the trial; that he could not bend the middle finger over quite as far as he did before it was injured, and that it would always remain in that condition; that the injury was very painful for the reason the nerves of the fingers were injured.

The court properly instructed the jury as to the measure of damages. Their assessment was exclusively for the jury and its verdict has been approved by the trial court, therefore, unless it is manifest that the jury was carried away by passion or prejudice, its verdict should not be disturbed by an appellate court. Seemingly the damages assessed are more than adequate to compensate the plaintiff for his injuries, but they only appear so to one who did not witness the trial, did not see plaintiff in his injured condition, or hear the witnesses testify in respect thereto. The learned trial judge having approved the verdict, we will

not convict him of error by pronouncing a different judgment upon it and therefore affirm the judgment against the Chicago & Alton Railway Company.

4.    Under the evidence we do not see how the jury could have done otherwise than find a verdict in favor of the Granite City & St. Louis Railway Company, and the judgment in its favor is affirmed.    All concur.